No. 83-470

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

FEDERAL AVIATION ADMINISTRATION,

              Petitioner and Respondent,

     -vs-

THE MONTANA STATE DEPARTMENT OF LABOR
and INDUSTRY: and 24 members of the
Professional Air Traffic Controllers'
Organization,

              Respondents and Appellants.

APPEAL FROM:   District Court of the First Judicial District,
               In and for the County of Lewis & Clark,
               The Honorable Henry Loble, Judge presiding.

COUNSEL OF RECORD:

     For Appellants:

          Norman H. Grosfield argued for PATCO, Utick, Grosfield
          & Uda, Helena, Montana
          R. Scott Currey, Dept. of Labor & Industry, Helena,
          Montana

     For Respondent:

          Allen R. McKenzie, Asst. U.S. Attorney introduces Karl
          B. Lewis who argued for FAA, Butte, Montana

                              Submitted:   June 12, 1984

                                Decided:   August 15, 1984

Filed:     AUG 15 1984

                    _Ethel M. Harrison_
          _____
                         Clerk

Mr. Justice L.C. Gulbrandson delivered the Opinion of the Court.

This case comes on appeal from an order of the District Court of the First Judicial District, Lewis and Clark County, reversing a decision of the Board of Labor Appeals which had granted twenty-four members of the Professional Air Traffic Controllers' Organization (PATCO) unemployment benefits. We affirm.

The terms of the PATCO members' employment were governed by a nation-wide collective bargaining agreement between PATCO and the Federal Aviation Administration (FAA). After the collective bargaining agreement expired in March, 1981, negotiations concerning a new contract ensued between PATCO and the FAA, and on June 22, 1981, a tentative agreement was negotiated. However, PATCO members did not ratify the agreement and bargaining for a new labor contract began again. When an agreement could not be reached, PATCO members withheld their services from employment beginning August 3, 1981.

All members of PATCO, at the time they were hired by the FAA, had signed affidavits that generally provided as follows: That the member had not participated in any strike against the government of the United States or any agency thereof, and would not so participate while an employee of the government of the United States or any agency thereof.

Various members of PATCO were warned that they should not strike or withhold their services, and a restraining order was issued against PATCO personnel in Washington D.C. In addition, the President of the United States ordered, in a televised statement, that the PATCO members should return

to work within forty-eight hours or they would be subject to discharge. On August 3, 1981, the chief air traffic control operators at Billings, Great Falls and Helena called the PATCO members and requested they report for work as scheduled. On August 4, 1981, the Regional Office of the FAA in Denver, Colorado, sent each Montana employee a telegram and directed them to return to work. Shortly thereafter, all members of PATCO who withheld their services were terminated from employment with the FAA.

Subsequent to their termination from employment, twenty-four Montana members of PATCO sought state unemployment benefits. On December 2, 1981, certain appeals referees sustained the determinations of various administrative deputies who had found the PATCO members were disqualified to receive benefits under the Montana Unemployment Insurance Act (the Act) because they were discharged for misconduct connected with their work. Specifically, the appeals referees found that each PATCO member was discharged by the FAA for violating 5 U.S.C.A. section 7311 (1980) and 18 U.S.C.A. section 1918 (1970) and concluded that the PATCO members were disqualified from unemployment compensation under section 39-51-2303, MCA, (discharge due to misconduct). Thereafter, the PATCO members appealed the referees' decision to the Board of Labor Appeals (the Board).

On February 3, 1982, the Board reversed the decision of the appeals referees and granted the PATCO members unemployment benefits. Relying on Continental Oil Co. v. Board of Labor Appeals (1978), 178 Mont. 143, 582 P.2d 1236, the Board found that since the PATCO members' strike was

part of an overall labor dispute they left their jobs because of a labor dispute and were not discharged for misconduct. The Board stated that "[t]he fact that the strike was in violation of Federal law does not terminate the strike itself from the flow of the other events in this dispute much as a 'wildcat' strike in the private sector would violate a 'no strike' labor agreement and civil injunctive relief to the employer." The Board concluded that section 39-51-2305, MCA, (disqualification when unemployment due to stoppage of work), rather than section 39-51-2303, MCA, (discharge due to misconduct), was the proper statutory provision under which to consider the issue of the PATCO members' eligibility for unemployment benefits.

On March 19, 1983, the FAA appealed the decision of the Board to the District Court. On September 8, 1983, the District Court reversed the decision of the Board and found that the PATCO members were disqualified from receiving unemployment compensation because they had been discharged for misconduct. Noting the PATCO strike was in violation of federal law, the District Court rejected the Board's interpretation and application of Continental Oil, supra, since that case did not involve an illegal strike.

From the District Court's decision reversing the Board, the Department of Labor and Industry and the PATCO members appeal to this Court.

The two statutory provisions pertinent to this appeal are as follows:

> "39-51-2303. Disqualification for discharge due to misconduct. An individual shall be disqualified for benefits if he has been discharged:
>
> "(1) for misconduct connected with his

work or affecting his employment until an individual has performed services, other than self-employment, for which remuneration is received equal to or in excess of eight times his weekly benefit amount subsequent to the week in which the act causing the disqualification occurred.

"(2) for gross misconduct connected with his work or committed on the employer's premises, as determined by the department, for a period of 12 months.

" . . .

"39-51-2305. Disqualification when unemployment due to stoppage of work. (1) Effective April 1, 1977, an individual shall be disqualified for benefits for any week with respect to which the department finds that his total unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed, . . . "

The definition of misconduct generally accepted in most jurisdictions and adopted by this Court in Gaunce v. Board of Labor Appeals (1974), 164 Mont. 445, 448, 524 P.2d 1108, 1110, was set forth in Boynton Cab Co. v. Neubeck (1941), 237 Wis. 249, 296 N.W. 636. In Boynton Cab Co., the court held that the term "misconduct" referred to conduct evincing such a willful or wanton disregard for an employer's interest as is found in the deliberate violation or disregard of standards of behavior which the employer has the right to expect of his employees or in negligence of such a degree or recurrence as to manifest equal culpability, wrongful intent, or evil design.

Appellants rely on Claim of Heitzenrater (1966), 19 N.Y.2d 1, 224 N.E.2d 72, in arguing that the PATCO members' strike did not constitute misconduct as defined in Boynton Cab Co. and Gaunce. In Claim of Heitzenrater, the New York

court held that employees who participated in a strike in violation of the no-strike clause of a private contractual agreement were not guilty of misconduct and were therefore entitled to receive compensation under the striker-benefit provisions of the statute. The New York court initially noted that the mere existence of a strike or other industrial controversy does not necessarily preclude a finding of misconduct. However, the court stated that in disputes arising out of private contractual agreements, a finding of misconduct would require the resolution of factual issues as well as complicated questions of labor law, and that such matters "are best left to agencies especially qualified to deal with them, namely the Federal and State Labor Boards and labor arbitrators," rather than the individuals administering the unemployment compensation laws. Claim of Heitzenrater, supra, 19 N.Y.2d at 7, 224 N.E.2d at 75-76.

However, the New York court subsequently held that in situations where the Legislature has specifically prohibited strikes or other concerted activity, an employee's violation of that proscription constitutes misconduct as a matter of law. Rodriguez v. Presbyterian Hospital (1973), 32 N.Y.2d 577, 582, 300 N.E.2d 418, 420. In Rodriguez, a hospital employee participated in a strike that had been expressly declared unlawful by statute because of the need to protect the public from the disruption of essential services in the area of health and hospital administration. The Rodriguez court noted that the traditional reluctance of the Legislature to intervene in the realm of employment relations was overridden in this case by a compelling need

-6-

to ensure the public safety in the critical area of health care. Given this important legislative purpose, the Rodriguez court held that violation of the statutory mandate prohibiting strikes amounted to "legislatively defined" misconduct. Rodriguez, supra, 32 N.Y.2d at 582, 300 N.E.2d at 419. Unlike violations of a private collective bargaining agreement, the legislation prohibiting strikes involved no complex issues of labor law because "the Legislature itself resolved all such issues by explicitly proscribing and expressly stamping as unlawful strikes and work stoppages by . . . public employees . . . " Rodriguez, supra, 32 N.Y.2d at 582, 300 N.E.2d at 420. The Rodriguez court concluded that the actions of an employee in violating the statutory prohibition against striking fell squarely within the misconduct provisions of the New York unemployment compensation statutory scheme. Rodriguez, supra, 32 N.Y.2d at 582-583, 300 N.E.2d at 420.

In the case at bar, this Court must consider the same issue as was presented in Rodriguez, specifically, whether participation in an unlawful strike constitutes misconduct as a matter of law. The facts reveal that a strike occurred which is unlawful according to the provisions of 5 U.S.C.A. section 7311 (1980) and 18 U.S.C.A. section 1918 (1970).

In Ranone v. Board of Review (1984), No. 82-368-M.P., 116 LRRM 2134, 2136-37, the Rhode Island court considered whether PATCO members, discharged from federal employment for engaging in the same illegal strike of August 3, 1981, were ineligible for unemployment compensation. The Rhode Island court stated:

> "We find persuasive the reasoning of the
> Rodriguez court in holding that the

> misconduct provision disqualifies an employee from benefits when the unemployment resulted because of an unlawful strike. Here, the federal air traffic controllers acted in violation of the congressional mandate that expressly prohibits strikes by federal employees. 5 U.S.C.A. section 7311. That statutory prohibition and the criminal sanctions provided pursuant thereto evince an unequivocal congressional intent to prevent the disruption of public services in order to 'ensure that the machinery of the Federal Government continues to function at all times without interference.' United Federation of Postal Clerks v. Blount, 325 F.Supp. 879, 884, 76 LRRM 2932 (D.D.C. 1971)."

We agree with the Rhode Island court's application of Rodriguez and hold that the misconduct provision of Montana's Unemployment Insurance Act applies to the PATCO strike and disqualifies the PATCO members from benefits because the unemployment resulted from an unlawful strike. The PATCO members engaged in conduct which was, at least, in deliberate disregard of the employer's interests and of the standards of behavior the employer had the right to expect of its employees. Gaunce, supra, 164 Mont. at 448.

We therefore hold that the actions of the PATCO members in engaging in a prohibited strike constituted misconduct under Montana law and the District Court did not err in holding that the PATCO members were disqualified for unemployment benefits under section 39-51-2303, MCA.

Affirmed.

_____
Justice

-8-

We concur:

_Frank S. Haswell_
Chief Justice

_John Conway Harrison_

_____

_____

_____
Justices

Mr. Justice John C. Sheehy, dissenting:

Let us first be clear about what this case involves. This decision does not mean the discharged air controllers will not receive unemployment benefits. They have already received them, and we all recognize the impossibility of recovering the benefits from the individual air controllers.

What the majority has done is agree that the already hard-pressed state unemployment insurance fund will reimburse the FAA for the cost of the benefits. Thus will the FAA escape fiscal responsibility for the ills which the federal government brought down on all of us by its refusal to correct the intolerable working conditions to which it had subjected and does now subject the controllers at our airports. We ought to put the responsibility for the payment, not on the employers of this state, but on the feds who indeed were more interested in breaking labor than protecting our air safety.

In the six years I have served the Court, I have been accorded the opportunity to write some far-reaching decisions, and to disagree with others equally far-reaching. In most of them, however, I saw where the Court could pride itself as a fair arbiter in deciding between the individual and the sometimes overwelming use of power by officials, better termed by Hamlet as "the insolence of office." Today I am not proud. My Court has called workers guilty of misconduct for obeying the call of their national union to strike. My stomach turns at this. Helpless in the power struggle, the air controllers chose to support each other in their cry for better working conditions. Misconduct? We should rather admire the courage it took to give up their

jobs and benefits rather then bend their necks to their would-be masters.

I do not exaggerate the abusive working conditions that led the controllers to their choice. In the Wall Street Journal of July 5, 1984, on page 10, there is quoted in part a letter to the FAA's administrator from the chairman of Pan American Airlines which states:

> "The air traffic controller problem has gone from bad--to worse--to horrible--to intolerable. [Pan Am is] now experiencing more frequent and more substantial delays in clear, optimum conditions than we were incurring during severe conditions a few months ago."

In the Billings Gazette, Tuesday, July 10, 1984, page 7B, one finds the Associated Press story concerning the increase in the number of flight delays in and out of major airports which causes scheduling and arrival troubles for the airlines. The airlines blame the Federal Aviation Administration for the over-burdened air traffic control system. The FAA, which cannot now blame the new air controllers it brought into position, blames the airlines. Here is a paragraph, three years after the strike, to dampen your soaring spirit:

> "The government's air traffic control system is still recovering from the strike three years ago when 11,400 controllers were fired. The FAA is 1,000 controllers short of what it considers full strength, and many of the current controllers are inexperienced."

We ought to place misconduct where it properly should lie, on the administration that brought this alarming condition about. We ought to recognize that the air controllers had the right in 1981 to the same principle that we applaud in the Declaration of Independence, that "when a long train of abuses and usurpations, pursuing invariably the same object, evinces a design to reduce them under absolute

- 11 -

despotism, it is their right, it is their duty, to throw off such government and to provide new guards for their future security."

We should not succumb, as most of government has, to government by Gallup Poll.

The statute on misconduct, section 39-51-2303, MCA, was never intended by the legislature to apply to unemployment caused by labor dispute. Misconduct in the sense of that statute refers to individual fraud, theft, vandalism, and other acts which bring about a firing because of those acts against the employer. The only statute we have applicable to a labor dispute is section 39-51-2305(1), MCA. In City of Billings v. State Board of Labor Appeals (Mont. 1983), 663 P.2d 1167, 1174, 40 St.Rep. 648, 655, we said concerning the labor disputes statute:

> "In examining the statute, note that the inclusion of the phrase 'stoppage of work' by the legislature is not intended to be a synonym for 'strike' or 'lockout.' If the legislature meant that a striking or locked out employee would be disqualified for benefits, it had to only eliminate the phrase 'stoppage of work' so as to make the section read that the individual is disqualified for benefits if his total unemployment is 'because of a labor dispute at the factory.' When the legislature inserted the words 'due to a stoppage of work,' it meant that the factor to be considered in connection with disqualification meant more than that the individual claimant was on strike, or locked out in a labor dispute. There may be a labor dispute and yet no stoppage of work.
>
> Montana has aligned itself with the majority of courts holding on the question that the phrase 'stoppage of work,' refers to the employer's operations rather than to the individual employee's work (citing authority.) This so called 'American rule' allows strikers to collect benefits so long as their activities have not substantially curtailed the productive operations of their employer. (Citing authority.)"

City of Billings, supra, and other cases (Continental Oil Company v. Board of Labor Appeals (1978), 178 Mont. 143,

582 P.2d 1236; Decker Coal v. Employment Security Division of Montana (Mont. 1983), 667 P.2d ~~1929~~ 923, \_\_\_ St.Rep. \_\_\_), have indicated our interpretation of the unemployment compensation benefits statutes as to leave the matter of labor disputes to the legislature and to the parties, and to determine the rights of workers to unemployment insurance benefits solely upon the provisions of section 39-51-2305(1) when a labor dispute is involved. The majority without discussion has departed from that position.

I would affirm the Board of Labor Appeals that no stoppage of work had occurred and that the air controllers were entitled to the benefits which they received. The effect would be to tell the FAA that it and not Montana employers must bear the burden of its intransigence.

_____
                  Justice

Mr. Justice Frank B. Morrison, Jr.:

I concur in the dissent of Mr. Justice Sheehy.

_____
                  Justice

I join in the dissent of Mr. Justice Sheehy.

_____
                  Justice